IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAYMOND P. NELSON,

    Petitioner,　　　　　　　　　No. CIV S-03-1978 FCD JFM P

    vs.

D. L. RUNNELS, Warden,

    Respondent.　　　　　　　　　FINDINGS AND RECOMMENDATIONS

         Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2001 conviction on two counts of assault with a deadly weapon, one count of battery with serious bodily injury, and an enhancement for inflicting great bodily injury. Petitioner claims that his rights under the Fifth and Sixth Amendment were violated by improper comments by the prosecutor on petitioner's failure to testify, and by ineffective assistance of his trial counsel in failing to object to one of the two comments made by the prosecutor.

FACTS[1]

Billy Jones, William Charles Tayloe, James Moon, and another
man identified only as "CI" lived in three tents in a homeless camp

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Nelson, No. C039850 (Oct. 18, 2002), a copy of which is attached as Exhibit D to Respondent's Answer, filed November 1, 2004.

1

located on the Sacramento River in West Sacramento. Jones, Tayloe, and Moon were alcoholics; at the time of trial, each had been admitted to an alcohol rehabilitation center. [Petitioner] was not welcome in the camp because he became violent when drinking.

While walking toward the river on May 28 or 29, 2001, Jones, Moon, and CI saw [petitioner]. Moon and [petitioner] argued and Jones told [petitioner], "Well, we don't want you here either. You did something to Charlie [Tayloe], and you're not welcome." [Petitioner] cussed as he walked away and threatened, "I'll get back at you." At trial, Tayloe recalled that his last encounter with [petitioner] about a month before May 30, 2110, had been "good."

About 9:00 p.m. on May 30, 2001, Jones was sitting in the doorway of his tent when he saw [petitioner] running toward the camp, carrying an object like a pool stick, and accompanied by an unfamiliar large, heavy-set man (six foot two inches, 260 pounds) later identified as "Kevin." Tayloe was sitting outside his tent with his back toward [petitioner]. He was eating a hamburger. [Petitioner] walked up, hit Tayloe on the back several times, and kicked off Tayloe's prosthetic leg as Kevin stood nearby. Jones grabbed a stick with a metal hook on the end which he used to pick up recyclable cans. Either Jones or [petitioner] yelled, "You want some." [Petitioner] swung his pool stick but missed Jones. Jones hit [petitioner] with his stick. They struck each other until Jones's stick broke in half. Jones had hit [petitioner] two or three times. [Petitioner] then struck Jones 10 to 15 times on his head, shoulders, and back. Jones fell to the ground and [petitioner] continued to strike Jones. Tayloe saw [petitioner] strike Jones three times while on the ground. Jones thought he had been hit one time while on the ground, thereafter almost losing consciousness. CI intervened and [petitioner] stopped hitting Jones. Before [petitioner] left, he leaned down and whispered into Jones's ear, "I did not know you had that in you." [Petitioner] and Kevin then left the camp.

Moon did not observe the assault, but heard voices including [petitioner]'s. He had been sleeping in his tent. Jones was bleeding and half-unconscious. CI placed a shirt on Jones's head to stop the bleeding. CI helped Jones to his tent where he spent the night.

Jones woke up the next morning and found a nine-inch circle of blood on his pillow. Moon reported the assault and West Sacramento police officer Jeff Neuman went to the camp. Officer Neuman interviewed Jones, Tayloe, and Moon separately and observed Jones's injuries which appeared "[f]airly fresh." Jones was transported to the hospital where he received 46 stitches in his face and hand. Jones had a cracked rib and severe bruising on his back. Officer Neuman saw some bruising on Tayloe's back.

      Tayloe was not transported to the hospital but at the preliminary hearing he claimed he had been.

      Officer Neuman interviewed [petitioner] a few days after the attack and seized a pool cue from [petitioner]'s motel room. Tayloe identified the pool cue as the stick [petitioner] had used. Officer Neuman received an address for Kevin but no last name. The person at the address claimed Kevin "had only stayed there and that he had left" and the person "had no idea where [Kevin] was staying in West Sacramento" but said Kevin lived in an unknown motel on West Capitol. Officer Neuman never found Kevin.

      Officer Neuman was called by the defense. He had assumed Jones, Tayloe, and Moon had all been drinking the night of the assault. Officer Neuman had known Jones and Tayloe for several years. When Officer Neuman interviewed Tayloe and Jones, neither claimed that [petitioner] had kicked off Tayloe's prosthetic leg. After taking his report, Officer Neuman learned that CI was present.

      The parties stipulated that no X-rays or CAT scans of Jones were taken. The prosecution submitted medical records to the jury as an exhibit in lieu of the testimony of the emergency room doctor.

People v. Nelson, slip op. at 2-5.

## ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

      Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

      Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

1  indistinguishable from a decision of the Supreme Court and nevertheless arrives at different
2  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406
3  (2000)).

4         Under the "unreasonable application" clause of section 2254(d)(1), a federal
5  habeas court may grant the writ if the state court identifies the correct governing legal principle
6  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the
7  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ
8  simply because that court concludes in its independent judgment that the relevant state-court
9  decision applied clearly established federal law erroneously or incorrectly.  Rather, that
10 application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,
11 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent
12 review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

13        The court looks to the last reasoned state court decision as the basis for the state
14 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

15 II.  Petitioner's Claims
16   A.  Griffin Error

17        Petitioner claims that during closing argument, the prosecutor allegedly
18 commented on petitioner's failure to testify.  Relying on Griffin v. California, 380 U.S. 609,
19 petitioner claims the two comments violated his Fifth Amendment right not to testify.  The last
20 reasoned state court rejection of this claim is the decision of the California Court of Appeal for
21 the Third Appellate District on petitioner's direct appeal.  The state court set forth the relevant
22 facts as follows:

> [Petitioner] cites two comments by the prosecutor.  The first
> comment occurred during the initial portion of closing argument:
>
> "You saw these witnesses testify.  You saw how they testified.
> Were they believable?  [¶]  That's the only story we have.  We
> don't have any other stories.  We don't have anyone coming in
> here and telling something else.  The [petitioner] has not put on

4

> one shred of evidence to tell you anything different than what these witnesses told you. Zero."
>
> Defense counsel did not object.
>
> The second comment occurred during the rebuttal portion of the closing argument:
>
> > "And, finally, their stories, the story from three witnesses you heard. And no story, zero, from the defense explaining this. Zero." Defense counsel objecting claiming that the prosecutor's comment violated [petitioner]'s right not to testify. The court overruled the objection.People v. Nelson, slip op. at 5-6.

The state court rejected petitioner's claim that these comments violated his Fifth Amendment right not to testify, as follows:

> Neither comment directly referred to [petitioner]'s failure to testify. Instead, the prosecutor commented on the state of the evidence, that is, [petitioner] failed to call logical witnesses to contradict the testimony of Jones and Tayloe who claimed [petitioner] attacked them. Kevin accompanied [petitioner] to the campsite and witnessed the entire assault. CI was present in the camp during the assault. No medical expert testified for the defense that [petitioner] suffered defensive wounds. Thus, no *Griffin* error occurred.
>
> [Petitioner] asserts that because Kevin could not be found and thus was unavailable, only [petitioner], who chose not to testify, could have supplied the story refuting the victim's account. We disagree. Office Neuman had been given an address for Kevin, went to the address and the person who lived at the address claimed Kevin had stayed there but left; the person did not know where Kevin was staying in West Sacramento, but Kevin was staying at an unknown motel on West Capital. Kevin arrived at the campsite with [petitioner], stood by while [petitioner] delivered his beatings to Jones and Tayloe, and then left with [petitioner]. The jury could reasonably infer that Kevin was [petitioner]'s friend and that [petitioner] probably knew where Kevin was staying or where he could be located. There is no support for the claim that Kevin was unavailable to testify for the defense. Even so, CI was present in the camp. Again, no *Griffin* error occurred.

Id. at 6-7. The state court also found that "even assuming there is a reasonable likelihood the jury would have understood the prosecutor's comment as a comment on [petitioner]'s failure to testify, . . . , it was harmless beyond a reasonable doubt." Id. The state court found that "[t]he

/////

5

prosecutor's remarks here were brief and indirect and did not fill any evidentiary gap" and that the case against petitioner was "very strong." Id. at 8.

> The Due Process Clause prohibits a prosecutor from commenting on a defendant's decision not to testify. Griffin, 380 U.S. at 615, 85 S.Ct. 1229. While a direct comment about the defendant's failure to testify always violates Griffin, a prosecutor's indirect comment violates Griffin only "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir.1987).

Hovey v. Ayers, 458 F.3d 892, 912 (9th Cir. 2006). In analyzing whether a prosecutor's indirect comment violates Griffin, "[c]ourts have distinguished between those cases in which the defendant is the sole witness who could possibly offer evidence on a particular issue, and those cases in which the information is available from other defense witnesses as well." Lincoln, at 810. Where Griffin error occurs, reversal is required "only '"where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal."'" Hovey, at 912 (quoting Lincoln, at 809 (quoting Anderson v. Nelson, 390 U.S. 523, 524 (1968) (per curiam))).

After review of the record, this court finds that the state court's findings that neither of the challenged comments was a direct comment on petitioner's failure to testify and that the comments were directed at the defense case as a whole are fully supported by the record.[2] The state court's finding that there was no support for petitioner's argument that Kevin was

---

[2] Respondent contends that petitioner's claim arising from the first comment is procedurally defaulted. It is true that the state court of appeal rejected this claim in part on the ground that petitioner had waived the alleged error by failing to object at trial. See People v. Nelson, slip op. at 6. The state court of appeal then went on to review the merits of the claim because it was accompanied by petitioner's claim that his counsel had been ineffective for failing to object. Id. Where, as here, the resolution of petitioner's claim on the merits is straightforward, the court is not required to expend additional judicial resources analyzing a procedural default defense. See Lambrix v. Singletary, 520 U.S. 518, 525 (1997).

unavailable to testify is also a reasonable finding based on the record.[3]  Finally, the state court's determination that any error that may have occurred was "harmless beyond a reasonable doubt" is both supported by the record and a reasonable application of controlling principles of federal law. In particular, the prosecutor's comments were brief, the evidence of petitioner's guilt was substantial, and there was no evidence that could have supported acquittal.

For all of the foregoing reasons, petitioner's claim that his rights under the Fifth Amendment were violated by the prosecutor's comments during closing argument should be denied.

### B. Ineffective Assistance of Counsel

Petitioner's second claim is that his trial counsel was ineffective for failing to object to the first of the two prosecutorial comments challenged in petitioner's first claim for relief.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

/////

---

[3] The state court's implicit suggestion that CI might also have been available as a witness for the defense is not as well supported by the record.  It is true that CI was present at the camp during the incident at bar, but the testimony of Billy Ray Jones, the victim of petitioner's beating, renders it unlikely that CI would have had any testimony useful to the defense.  See Reporter's Transcript of Proceedings (RT) at 105-06, 112-13.

1  Second, a petitioner must affirmatively prove prejudice. <u>Strickland</u>, 466 U.S. at
2  693. Prejudice is found where "there is a reasonable probability that, but for counsel's
3  unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A
4  reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>;
5  <u>see</u> <u>also</u> Williams v. Taylor, 529 U.S. at 391-92; <u>Laboa v. Calderon</u>, 224 F.3d 972, 981 (9th Cir.
6  2000).

7  For the reasons set forth in section IIA, <u>supra</u>, the first comment by the prosecutor
8  was not an improper comment on petitioner's failure to testify. A <u>fortiori</u>, counsel was not
9  ineffective for failing to object thereto, nor is there any reasonable probability that the outcome
10 of petitioner's trial would have been different had counsel raised an objection to the comment.
11 Petitioner's claim of ineffective assistance of counsel should be denied.

12 For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that
13 petitioner's application for a writ of habeas corpus be denied.

14 These findings and recommendations are submitted to the United States District
15 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty
16 days after being served with these findings and recommendations, any party may file written
17 objections with the court and serve a copy on all parties. Such a document should be captioned
18 "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that
19 failure to file objections within the specified time may waive the right to appeal the District
20 Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
21 DATED: October 10, 2007.

UNITED STATES MAGISTRATE JUDGE

25 12;nels1978.157